Case number 20-2286 in the case of Gerald Byrd v. Randall Haas et al. Mr. Krakow, you could go for the appellant. Good morning, Your Honors, and may it please the Court, Jeffrey Krakow on behalf of Plaintiff Appellant Gerald Byrd. Your Honors, I would like to reserve five minutes of my time for rebuttal. Thank you. Your Honors, for the past six years, Mr. Byrd has been trying to obtain equal treatment and the right to freely exercise his religion, which is the Ifa religion. And at every junction, defendants have delayed and blocked his requests, which have resulted in the constructive denial wholesale of his right to practice the Ifa religion. Can I ask you just a preliminary question? Yes. I'm sorry to interrupt you. In your reply brief at note one, you indicate that they've indicated at least as of April maybe that they were going to give him his religious services and they were considering his request for beads and other things. What's the status of that now? We're in October. I'm glad you asked, Judge Lepar. The status is that we are nowhere. So he hasn't had group services? No. And if you look at the policy, which is publicly available on the Michigan Department of Corrections website, it hasn't even been amended. So not only have the promises that were kind of made or the indications made in that memorandum not come to fruition regarding the renaming of the Yoruba, as they term it, the Ifa religion. There's been no extension of group services. And we're still six months later, still nowhere, anywhere closer to getting... I'm sorry to interrupt you. Is he in the same prison? Yeah, well, when the incidents giving rise to his case occurred, he was in Macomb. He has since been transferred to Lakeland, which is in Coldwater, Michigan. He's still in Lakeland. He has been the entire time I've represented him. And the only reason I'm asking is there's five or more members of his faith still in that prison? No. No, Your Honor. Not by my understanding, but that's not relevant to this consideration before the court and here's why. Mr. Berg needs first approval to have group services. Now whether or not he's able to meet that five-member threshold, that's a question for another day. If there are indeed five members, then basically the first day, let's say, for example, there's five members of the Ifa religion at Lakeland. He should be able to immediately get group services because by that point, the policy should be clear. And the policy six months ago, it was announced, well, there's going to be this change, and it hasn't happened. So... Go ahead. So what does the injunction look like that you would want here? I think that the injunction is, one, that group services need to be held, and two... So not that any... So we're past the point of the prison officials considering or moving his request along or whatever it is. We're done with that. You want this court or the lower court to say, group services, he's got to have group services, he's got to be allowed to have the religious instruments, whatever it is. I do agree that we're past that point, Judge, and here's why. Because in the lower court, Mr. Burt has done everything that's been asked of him. He's demonstrated a sincerely held religious belief. He's demonstrated a substantial burden. And at that point, the burden shifts. It shifts to the defendants to articulate and to pass strict scrutiny to articulate a legitimate peniological interest, and they failed to do it. Can you just take a step back? So I agree with you. Your best argument is constructive denial. Imagine we're trying to design a clear test so that prisons know at what point... What factors would we look at? How do we figure out that it's a constructive denial? Does that make sense? In other words, would six months be a constructive denial? When do we know that, okay, now it's too long? I get your case is on the one extreme, but we've got to prevent the slippery slope backwards to where prisons have no time to make these determinations. And so how do I draw up the factors, or how do you help us draw up the factors? Your Honor, I think that first, in order to bring a suit in the first instance, he has to go through the prison's entire grievance process. So he has to satisfy that before he's even allowed through the courthouse doors, which he did. Right, but let me... Can I take a step back there? So you're just saying the plaintiff has to go through it, because here, one of your faults is they didn't pass along as they were supposed to his grievance. And they didn't. And they were consistently reminded of that. So it's not as though the prison here, and I recognize you're asking me to go broader than my factual circumstances, but it's not as though they were only told once, oh, there's a grievance, we forgot about it, they were reminded multiple times. Now if you're looking broader than that, I do think that there has to be some indication that the process is ongoing, or that it hasn't stalled out. And here, by their own admission, they weren't doing anything with the process. They weren't continuing in any way, shape, or form to process the request, and they didn't until midway through his suit, I sent a letter to them saying, okay, let's restart this again. They don't want more years to elapse. I'm sorry. Go ahead. You go. At the time you filed the complaint, if the judge had granted the relief, you must get the process moving. Would that have been okay? And fast forward to today, given the passage of time, considering when the lawsuit was I think you do just basically need to grant relief. At the time of the complaint, you would have been okay with pass the request up to the necessary authorities and timely make a decision? I don't think so, Your Honor, because again, the actual requested relief he's looking for here is the religious accommodation. He's looking for the free exercise right that he's guaranteed. And so by the time we're looking at it as the day that we filed the complaint, I think at that point we're kind of locked in. And the reasons for the denial or the inaction are locked in. And post hoc rationalizations don't pass muster under this court's precedent. So if at that point they say, okay, let's get started, I don't think it's enough to then go back and say, well, now you have to go back and start the thing that you should have started months or years before. Now there's still this doesn't lead to a slippery slope argument. And I can kind of see where the court's going with this. Imagine, for example, that Mr. Byrd had filed suit. Imagine that everything's locked in, that everything that has taken place in this case happened where they haven't considered it at all. If the prison system had simply started at that point, and at some point over the years of litigation said, okay, we've considered it, now we've granted you group services. We've granted you the right to possess the religious articles. I think that that would move some of the injunctive relief I was looking for. And that would have nothing to do, they could have remedied it, basically, and taken out the guts of the lawsuit from underneath me. And I think Mr. Byrd at that point would have been left with his 1983 claims, First Amendment, equal protection, procedural due process. I feel like we're back to where Judge Tappar was with the question five minutes ago, which is, how do we decide how long is too long that they're sitting on something? You're saying, well, once we file suit, you're locked in. So either we order you to do something, or we don't. And then at that point, we're measuring, well, it's been three years since he initiated the process, or two years, or one year. I mean, what do we look at to decide whether it's been too long? Well, again, with the factual circumstances in this case, I would certainly submit six years is past that mark. And Haight establishes that four and a half years is past the mark. Questions where we have exhaustion requirements, where we say the exhaustion requirement has been satisfied, even though there hasn't been a decision because of futility, or it's in vain. Or, look, it took five years, and we're going to deem you to have satisfied an exhaustion requirement, because you can't just sit on something. The state can't sit on something forever. But what do we look at? I think you still do look at that exhaustion requirement. The state can't sit on it forever. And if you let them sit on it forever, if you let them go back and say, well, we're still processing, still processing, still processing, it ends up gutting RLUIPA, because then nobody can ever sue for an accommodation. And if the state is clever about it, they'll just say, well, we're still thinking about it. But is there any case, though, that you can cite where 12 months is enough to wait, or 18 months, two years, three years? No, the line drawing problem still exists. I agree there. I will say that it's already been clearly established in Haight, four and a half years is too long. Judge Sutton, when he authored Haight, goes that far. As far as, well, is three years enough? Is two years? I do think once we start entering a period of years, though, your honors, there should be movement. There should be an analysis. The state should at least be able to stand up in court and say, this is actively being submitted, and we actively considered it at the last meeting. We're expecting a decision within X number of months from now. And again, that would have happened before the district court. When you're, just to clarify, when you're talking about how many years it took here, are you going from first request made to today, or to complaint being filed? So the first request was in September 2015. That's over six years. I believe Mr. Bird's complaint, if I can remember the docket number, was filed in 2017. So we're at four and a half or five years. So either way, we're at a pretty substantial amount of time. His complaint in court? Yes. I thought it was 2019, but maybe I'm wrong. No, I was appointed in 2018, and I believe his complaint had been filed in 2017. All right. So, well, the relevant time, it seems to me, is between initial request and initiation of legal action, right? If your position is, once the complaint is filed, we're in a different world, they can't just kind of scramble to give you the process you were due, right? Either they can, at that point, you're saying they have to give me what I want, not just process. Then the relevant time period for an exhaustion type requirement would be when you file that complaint versus when you initiate it, right? I think that when you initiate the request, you're still having to proceed through the multiple administrative barriers internally. So you still have an opportunity for the state to correct the action during that time. Now, I still do think, as long as you've satisfied that, you have a right controversy, yes, you should be able to perhaps look at it between when the complaint was filed and when it was first requested. But I don't think that should bar prisoners like Mr. Byrd from seeking relief in court. I mean, he's acted diligently here on a pro se basis to try and advance this. I think the record in our case certainly reflects that he attempted a good faith effort above and beyond to remind everybody that he was out there. And nothing ever happened. I'm sorry. I have one question. So this is related to your, you also brought a procedural due process claim. And I just want to understand real quick. If we were to hold that there was a constructive denial, you would in effect have gotten your process, right? Because, and I may be thinking about this wrong, but just help me. So you're saying, A, we're entitled to free exercise. And B, we're entitled to have our process. Even if the process is a denial, you get your process. Your process doesn't guarantee you a win. It just guarantees you process. Once we hold that at point X it's a denial, is that fair to say you've gotten your process or would you still have a theory of procedural due process? And if so, explain it. I think that if you were to interpret it as a constructive denial at point X and that that therefore is the process, you would still have a claim for a procedural due process violation because there would still be damages resulting from the denial of that due process up until that point. So you would still have to measure damages probably on a per diem basis such as used by this court in King v. Amaro. Let me think this through just for a second. So if I said at two years, let's just make up a time. Two years is the magic mark. If a person doesn't act in two years, courts will going forward treat it as a denial. Bright line test, like Justice Scalia liked. Okay? So we've got a two year thing. If he went through the system and got a denial at two years, you'd say, yeah, I got the process I was due because that was the deadline. Why is it any difference in this circumstance once we say at point X it was a denial? Are you saying thereafter? So if we say two years, then every year thereafter he's entitled to damages, but wouldn't that be for a failure to give him his religious rights that he's entitled to? Because you'd have to be entitled to something, and here you're claiming it's your free exercise rights. It's free exercise. It's equal protection. And I do see what the court's saying. You wouldn't want to double count damages. But if you go back and say after the fact that two years was where the constructive denial was, I think you still have this irrational roadblock that Defendant Haas was denying him process. There are two different injuries. Why would it be double counting? I wasn't given my process for two years, and it resulted in a constructive denial. It was basically a denial without process after two years. It was arbitrary. So I didn't get my process, and I was denied. So wouldn't you get the damages for the denial of the process, and you'd have the constructive denial? I think that's a good point, Judge. And frankly, it's one I didn't quite grasp from Judge Lepar's question. But I do think they are disparate. There still is the denial of the free exercise right. There's still that ongoing violation. There's still a denial of the equal protection right. There's still a denial of due process again. OK. Any further questions? Thank you. You'll have your rebuttal time. Thank you, Your Honor. Good morning. May it please the Court. I am Assistant Attorney General Jennifer Foster on behalf of defendants Haas, Leach, and McKee. There's really one thing I want to bring back to the forefront for this Court, and then I'd be happy to take your questions. We never get to the policy in this case. This is a procedural matter. In the complaint, Mr. Byrd's allegations were against these three individuals and their very specific allegations of inaction. And the District Court recognized from its very first order, arguing on exhaustion, that Mr. Byrd hadn't challenged policy in his complaint. That didn't come until the response of Leach. I mean, Leach wasn't even following the policy. He admitted he had no discretion but to forward the request, and yet he didn't do so. I'm sorry, Your Honor. Did you just say Leach? Leach. Actually, perhaps you mean Defendant Haas. I thought it was... Is it... Haas was the warden at the facility. Yeah, but Leach said at page ID 2020 that he did not believe they had any discretion to the warden regarding whether or not to follow. So you're right. That Haas should have forwarded it to what, CAC or wherever it was supposed to go. I'm sorry. Yes, the Special Activities Coordinator is Leach. Okay, so here we have... Because Leach says to Byrd, I get that you sent it to me, but you're supposed to send it to the warden when he sends his first request out. Correct. And basically, he did send it to the warden. Well, we don't... So, Your Honors, we don't have anywhere in the record proof that Mr. Byrd ever properly submitted it to the warden prior to Mr. Krapko submitting it to the warden at the new facility. The district court determined for the purposes of ruling on the motion for summary judgment that it had been properly submitted. But if you go back and look, there's no evidence of that. The first time we see who received that request, it was down the line of the chain of command to the Special Activities Coordinator, Leach. So policy sets forth a certain procedure that the prisoners have to follow in order to make these requests. The requests have to contain certain information so that it can all be properly considered. It has to have everything that they want as far as if they want, in this case, more religious property. When he gets to Macomb in 2016, he submits his second request to Haas along with Leach and McKee, right? And I thought, correct me if I'm wrong, I thought there's a time stamp that Haas received it no later than the end of March. There is a time stamp where it finally gets to his office, but that doesn't mean that the request was properly made. Why isn't all this an issue of fact? I mean, in other words, okay, so let's assume that your defense is it was never properly submitted, right? Well, maybe it's not an issue of fact, but why? Leach got it, right? Leach doesn't dispute. He got it. Correct. And he gave it to like a chaplain at some point. So this case is very hard to argue orally. The best way to look at it is on paper because there are so many people and so many facts and so many different analysis that have to happen. And so I truly believe the best way you can look at this is to make a little chart, figure out how this all happened. So let me just give you some facts and you tell me where I'm wrong. Okay, that might help. February 2016, Bird says he sent it to Haas, Leach, and McKee. We agree on that, right? That's what he says, yes. Okay. March 2016, there's a time stamp that Haas received it. We agree on that, right? You agree? Yes. Then Haas sends it, I always mix those two up. Haas sends it to the chaplain. You agree on that? Yes or no? I think I agree on that. I'm having to think through the facts myself. Okay, but well, you've got your cheat sheet so you can look at it. But he never forwards the request to Leach himself, right? Correct. And Leach says Haas has to forward it. Yes, according to policy. But what is a prisoner supposed to do in this situation? He needs to follow policy. Your Honor, just because a prisoner submits something, let's take the briefcase for example, just because they submit a piece of paper as a grievance does not mean it properly applies with all of the necessary requirements that are set forth in policy to have that grievance be considered. And we know in exhaustion situations that they have to follow this process. The same thing goes for this religious policy. Wait a minute. Let me get this straight. So he submits it. You don't tell him you haven't followed the policy. The first time you say you have to submit, Leach says submit it to the warden, which he thinks he's doing. The second time he submits it to the warden who passes it to the chaplain. He doesn't go back to Byrd and say no, you've got to dot your i's and cross your t's. He submits it to the chaplain, right? To go and talk to Mr. Byrd about the proper procedure that has to be done. If you go back and read the motion for summary judgment in the record, it outlines more of the procedure that wasn't followed. As far as Mr. Byrd didn't write this request. He didn't sign this request. There is a procedure in place for a reason to make sure that as this travels through the chain of command, and the warden, his job, while he has to forward a properly submitted request, his job is to make sure that the request has everything that it needs in it so that it can be considered. Because the fact is, after it goes to the special activities coordinator.  I'm sorry? Leach didn't do it, right? Because Leach just said you've got to submit this to the warden. Special activities coordinator Leach isn't there at the prison. Yes, it wouldn't be his responsibility to go down and talk to this prisoner. He is in the middle of the chain of command. He has nothing that he can do until he properly receives this request through the chain of command. But if you go back and read the motion for summary judgment, it outlines in there the that the chaplain was trying to explain to Mr. Bird that he needed to write the request, addressing it to this warden. I thought White, the chaplain, copies it and sends it to Leach and says, hey, he's still asking for this property. Yes, but again, we're now jumping the chain of command. That's why in this, the district court decided.  Haas is the warden. Haas gives it to White. White meets with him. White then sends it to Leach and says, hey, he's still asking for this. No, Your Honor. Mr. White, if you go back and look, Chaplain White gives it back to Warden Haas because Chaplain White testified that he was not Haas's designee. So after he talks to... Are you disputing that he said at page 1891 that he told Leach he was still asking for his property? I'm not saying that he's saying that Mr. Bird is still asking for his property. Your Honor, I am saying that Chaplain White doesn't have the authority to send it on anywhere. And if you go and read his deposition, and I think I outlined this in my brief, Chaplain Leach gives it back to Warden Haas after he has it. It is Warden Haas's responsibility to pass it to an area assistant director, who then passes it on to Special Activities Coordinator Leach, who from there passes it on to an agency... Sounds like a bureaucratic nightmare. Can a state set up such a nebulous maze that you can effectively deny everyone their religious rights? Not an effective denial, Your Honor. The next place that it goes in this process is to the Chaplaincy Advisory Council. They are not even attached to MDOC. It is a group of volunteer... Did they ever get it? After Mr. Krapko properly submitted it, yes. So when was that proper submission in your mind? It was, according to Mr. Krapko, July 22, 2019. That process then got started. And even in... So it's two years and he still hasn't gotten anything? Your Honor, if you will allow me, 2020 canceled everything. The Chaplaincy Advisory Council only meets twice a year. He is aware of that. That came out during Deputy Director McKee's deposition. Mr. Krapko testified to Mr. McKee. Are you aware? I'm sorry? Do you even have to meet? Do you think you have a meeting requirement? Do you have to meet once? Do you meet twice a year? Do you have to meet at all? Well, during time... Every three, you have to meet, right? Yes, but... So the properly submitted request, and he's aware. It made it for submission and it made it for consideration to the Chaplaincy Advisory Council. During 2020, COVID canceled everything and they didn't meet. In April of 2021... Anyway, so there were no meetings in 2020? No meetings in 2020. In April of 2021, the Chaplaincy Advisory Council considered this request and they recommended to the Deputy Director that it be granted. If I wanted a cross, a non-dangerous cross, and I requested it in 2019, you could say it has nothing to do with group services. You could say, because we can't meet, we can effectively deny it, or a Bible. Let's use a Bible as an example, or a Koran. If I wanted a Bible or a Koran, and I requested it, the prison could say, well, we can't meet because of COVID, so we can't give you a Bible or a Koran. I think that a book might not be the best example to use for that, Your Honor, because without being religious property, the prisoners are allowed to have books, regardless of... Okay, a rosary. A non-book devotional process. Yeah, a rosary. I want a rosary. The people who are meeting are outside of MDOC, and according to policy, the Deputy Director, who is the final decision maker, he can't... He has to base his decision off of their recommendation. So you can effectively... Your position is, you have no obligation to meet, can't meet virtually, even though the rest of the world is on Zoom. You can't meet via conference call, even though we've been doing conference calls for 20 years, and you can deny people religious rights by using this as an excuse. Your Honor, I don't really... I think that under the circumstances, especially when COVID first hit, we were confused about how to handle things. Things were shut down. I understand, but people adapted. Even we were able to adapt and do things via Zoom. You're telling me an advisory council can't get on the phone? Your Honor, I'm not on the council. I'm sorry, but what I'm telling you is... But we should hold Michigan accountable for that, right? It's your council. You pick your policy. Can you effectively outsource it and then say, we're not denying religious rights? No, and I don't think that that's what happens, but I think the council serves a very important role, and this request has been approved. Mr. Krapko can sit here and tell you that it hasn't, and it's still an ongoing process, but the... So has he gotten his beads? Can I please explain to you, Your Honor? No, wait, you said it's approved. It is. It has been approved, and he's gotten notice that the request is approved. However, what happened... In April, right? In April. Wait, did he get his beads? It's a yes, no. Not yet. Did he get group services? Yes, not yet. The policy is being drafted. Your Honor, the... All this started in 2015. But that wasn't with Warden Haas. He was at a different facility. So he wasn't... Okay, 2016, he's with Warden Haas. So it started... Let's... We'll give you the benefit of the doubt. Five years ago, it started, and this guy has still not gotten group services or his beads. And, Your Honor, we have to come back to the complaint again. That isn't what he was... Fired this lawsuit about. If this had been denied, then we could sit here and talk about whether or not he was approved for his group services. Mr. Krapko is sitting over there. As you said yourself, he's made it clear from day one that he... This guy wants his beads and religious services. And what you're telling us is even though you can take 2017, you can take 2019, you can pick your date. To this day, even though in April they said, yes, you get this stuff, he hasn't gotten it. Where six months later, he still hasn't gotten it. Correct. I'm hoping that any day now the new policy will issue. I did check on this, and the Chaplaincy Advisory Council did recommend to the Deputy Director of MDOC that the requests be approved. The list of property that Mr. Byrd wanted was very lengthy and contained some things that he can't use individually, that would have to be used during group services, or things that could actually be a safety and security issue. You allow people to have beads, right? There are inmates who have beads. Why can't we give him his beads? I'll have to ask them that question, Your Honor. Well, you represent them. Can't you call them up and say, give him his beads? Mr. Krapko is right there. I'm sure if you called him and said, we're giving him his beads today, he'd say, thank you. But Your Honor, not everybody who is in prison... MDOC doesn't recognize every religion. They've recognized his, you said. Well, they have. And they had already previously recognized this religion and previously considered religious property. And so now the request, what it is, Deputy Director McKee, and not McKee, Deputy Director... What's the new director's name? I forget. He asked the Chaplaincy Advisory Council, he approved the request, and he asked them which of the religious property items could be used for individual services. And my understanding is that recommendation has come back and MDOC is currently in the process of redoing the policy. So after it was approved by the Deputy Director, he wasn't sure of the lengthy list of property that Mr. Byrd requested, which of those things could be used individually. And so that went back to the Chaplaincy Advisory Council for additional information. And now the policy is being redrafted. And I tried to check right before coming on when it was supposed to be issued, when the new policy was supposed to be released, but I couldn't get ahold of anybody to find out. Any further questions? No. Okay, thank you. Thank you, Your Honors. I have just a few things in rebuttal. I'd like to clarify the timeline and the actors here. The policy is actually quite simple. It says if you're a prisoner, you submit a written request to your warden or his designee, and it needs to contain what articles you're requesting and why they're significant to your religion. That's it, full stop. That's all that's required from Mr. Byrd. He satisfied that. Then the warden, it's the same process, Your Honor, except it's found a little bit later and policy could be organized a bit better, but it's there. From there, the warden or his designee must forward the request to the Special Activities Coordinator, that's Leach. Leach then must forward the request to the Deputy Director, who then receives a recommendation from this outside group, this Chaplain Advisory Council. All along the way, there's really no dispute that Mr. Byrd did everything he's supposed to do. He followed the plain letter of the policy that's in writing. We're not basing it on a policy violation, though I think their policy violation is evidence of the fact that there was no legitimate basis here. What did you do when you got involved? What was it that you did? Did you submit a new request? Yes. Did you fix it, or what was the... I want to phrase this carefully. When it became clear that we were never going to get any traction on this case to get Mr. Byrd his beads, get him his mat, get him the things that seem uncontroversial, I said, well, let's do this. Let's submit a new request in July and we'll kind of give the defendants an out here and say, okay, we're going to submit a new request. Maybe this is what the holdup is. They just don't want to move off their litigation position. And I waited for over two years. And I don't think I did anything novel here. I followed the policy, except this time it came with a lawyer's name rather than Mr. Byrd's. But Mr. Byrd followed the policy too. And I... July of 19? July of 19, yes. And I think that what you're hearing here... I mean, they get some slack because of COVID, right? I don't think much because at the end of the day, what Judge Thapar mentioned was exactly what I was thinking. I was on Zoom calls relatively soon after. Okay, well, let's say it takes them a while. My people I know who work for the state were dealing remotely with their work. And at the end of the day, you can't launder the delay by saying, well, it's not us anymore. Now it's this outside body. At the end of the day, it's Deputy McKee. He's the one who makes the decision. He's the one who gets the recommendation. And... But he can't act without that recommendation. Is that part of their policy? It says... Let's see if I have... He's supposed to present the material to the Chaplain Advisory Committee. The CAC makes a recommendation to him. And then Deputy McKee is supposed to consider, one, whether the religious item is necessary to the religion, and two, whether it would pose a threat to the custody and security of the facility. None of that has ever happened, as far as I know, up until perhaps recently. And it's important to recognize that Deputy McKee testified that in his entire career, and I recognize he's since retired, but his entire career, he'd never conducted the analysis and he didn't even know how he would do it. That shows you that this is a right without a remedy. This is an endless bureaucratic morass, and it's... You've heard again today that what's been characterized by this court is kind of... I mean, Michigan is a repeat player in this court. They've got... They recognize all kinds of religions. They have devotional accessories that are... I mean, so... I mean, they do... This process does work at some level, doesn't it? I haven't seen it work in the entire time I've been here, and Deputy Director McKee says that it hasn't worked. If you're looking at the history, and this is interesting, if you look back into IFA, and when it was first approved, it was in the 90s, and they said, well, it's not a religion, it's a way of life. So that's where I looked at first when I got involved with this case, but it absolutely is a religion. So I thought maybe we're fighting that. Well, it turns out we weren't fighting that. We were fighting about whether it was okay to handwrite it, or whether he can type it, or whether it needs to be on the right letterhead. And we never actually engage with the religious necessity for these articles. And that's what's required under ALUPA. That's the accommodation he's requesting. And I really want to remind the Court here, because we haven't talked that much about his Equal Protection Clause claim, but it's very important, because the items in many instances are an apples-to-apples comparison with what's already been approved for other religion. When we talk about beads, when we talk about religiously significant netware, when we talk about a prayer mat, these are things that have already been approved, and these are things, as you put it, Judge Nalbandian, that MDOC is aware of. They're comfortable with. They know this. I mean, there are some items I will grant you that are a little bit new, and that are particular to IFA, but that's what the religious accommodation that RLUIPA requires is. They need to take a look at it. They need to actually consider it, even if it's an unfamiliar religion. And there's still instance and instance and instance where it already has been approved. Thank you, Counsel. Thank you, Your Honors.